**Bernard PODOLSKY, d/b/a Podolsky Oil Company, Plaintiff–Appellant,**

v.

**ALMA ENERGY CORPORATION and Equinox Oil Corporation, Incorporated, Defendants–Appellees.**

ALMA ENERGY CORPORATION, Equinox Oil Corporation, Incorporated, M. Michael Galesi, and Stephen D. Layton, Cross–Appellants,

v.

Bernard PODOLSKY, d/b/a Podolsky Oil Company, and Michael Podolsky, Cross–Appellees.

Nos. 97–2533, 97–2781.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1998.

Decided May 5, 1998.

Stephen D. Gay (argued), Husch & Eppenberger, Peoria, IL, George c. Lackey, Lackey & Lackey, Centralia, IL, for Bernard and Michael Podolsky.

Scott C. Helmholz (argued), Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, for Alma Energy Corporation, Equinox Oil Company, in No. 97–2533.

Scott C. Helmholz (argued), Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, James B. Bleyer, Bleyer & Bleyer, Marion, IL, for Alma Energy Corporation, Equinox Oil Company, M. Michael Galesi, Stephen D. Layton, Equinox Oil Company in No. 97–2781.

Before BAUER, WOOD, Jr., and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

Bernard and Michael Podolsky sued Alma and Equinox Corporations alleging breach of contract, fraud, and estoppel from a land deal gone bad. The Podolskys alleged that they entered into an oral contract with Equinox to purchase the Illinois operations of a third oil company, Union Oil Company of California. The district court entered summary judgment in favor of defendants Alma/Equinox. On appeal, the Podolskys argue that the court erred in granting Alma/Equinox's motion for summary judgment because a genuine issue of fact exists as to whether the parties entered into an enforceable oral contract to purchase the land. Also on appeal is the Podolskys' motion to dismiss Alma/Equinox's counterclaim. Alma/Equinox argue that the district court erroneously dismissed its abuse of process counterclaim against the Podolskys. For the reasons set forth below, we reverse the court's grant of summary judgment and affirm its grant of the Podolskys' motion to dismiss the counterclaim.

## BACKGROUND

Bernard Podolsky is an independent oil producer and operator who does business as Podolsky Oil Company ("POC") in Fairfield, Illinois. Bernard Podolsky has been a petroleum engineer and geologist since 1938. Since 1950, Podolsky has been the owner and sole proprietor of POC. Podolsky's son, Michael, is also a geologist and works for POC as a petroleum geologist and manager. As of 1994, POC owned and operated over 300 wells in the Illinois basin.

Equinox Oil Corporation, Incorporated ("Equinox") is an oil well operating company based in Woodlands, Texas. Equinox has 140–150 employees and operates the oil properties owned by its sister company, Alma Energy Corporation ("Alma"). Alma has no employees, but has as its assets a number of oil properties in seven states. Equinox's employees investigate and evaluate properties for Alma to acquire. Both Equinox and Alma are owned and operated by Stephen D. Layton and M. Michael Galesi. Layton is in charge of the day-to-day operations of both Equinox and Alma.

In February 1994, Michael Podolsky learned that Union Oil Company of California ("Unocal") was planning to sell its Illinois operations. Unocal's Illinois operations consisted of oil and gas leases covering more than 40,000 acres of land located in thirteen counties in southern Illinois. Some of the Unocal properties adjoined POC properties, and Michael Podolsky learned of Unocal's planned sale through relationships with Unocal employees and consultants.

On February 22, 1994, Michael Podolsky contacted Steven Gault, Unocal's disbursement manager, to inquire into the details of the sale. Gault informed Michael that Unocal would only sell the property to companies with assets in excess of $50,000,000. Podolsky's assets were not that large; Gault told Michael that if POC wanted to bid, it should do so jointly with a larger company.

On that same day, Michael Podolsky contacted Robbin Jones, Equinox's resource development manager, to gauge Equinox's interest in joining with POC to acquire Unocal's Illinois properties. Michael and Jones had known each other professionally for about two years. Jones' responsibility at Equinox included locating and evaluating properties Equinox might be interested in acquiring or operating. Michael was unaware at that time that Equinox used a separate holding company to hold title to the properties it operated.

Michael proposed to Jones that POC take a one-fourth or one-third interest in a joint venture with Equinox to evaluate and acquire the Unocal properties. Jones replied that

Equinox might be interested in pursuing the deal and that he would discuss the proposal with Stephen Layton, the owner and executive vice-president of Equinox. Jones told Michael he would call him with Layton's response.

Jones did call Michael and said that Layton was interested in pursuing the Unocal properties. The parties agreed to work together to jointly evaluate, bid on, and attempt to acquire the Unocal properties. At this point, the relationship was exploratory: no documents were drafted, and the parties had yet to explore the deal or evaluate the properties. For the next seven months, the parties explored the Unocal deal. Michael and Bernard Podolsky and Jones had more than eighty phone conferences, ten meetings, and exchanged numerous faxes, e-mails, and letters. None of these correspondences, unfortunately, memorialized their continuing negotiations.

In June of 1994, Unocal sent Layton the "Illinois Assets Confidential Memorandum," or the bid package. As the name implies, the Unocal documents were released only on the condition of strict confidentiality. Jones immediately forwarded a copy of this bid package to the Podolskys, with Layton's knowledge. In late June of 1994, the Podolskys met with Jeffrey Finnell, Equinox's petroleum engineer, to prepare him for a meeting at Unocal's "Data Room" in Sugarland, Texas. The "Data Room" meeting was set up by Unocal to provide bidders with detailed information about the properties. On July 7, 1994, the Podolskys traveled to Houston, Texas, to meet with Equinox representatives in final preparation for the "Data Room" meeting the following day. Both Bernard and Michael Podolsky were in attendance at the meeting in Sugarland, Texas the following day. Prior to entering the room, Jones asked Michael and Bernard to identify themselves on the sign-in sheet as "consultants" for fear that Unocal might back off if it thought other people were involved. The Podolskys did as they were asked. The sign-in sheet indicates that seven people signed in under the company name of Equinox and that Bernard Podolsky signed in as a "consulting engineer" and Michael signed

in as a "consulting geologist." See Defendant's Exhibit AA235.

On August 15, 1994, Michael Podolsky received a telephone call from Michael Barret of Dart Oil Company, another approved bidder for the Unocal properties. Barret inquired whether Podolsky would be interested in a joint venture with Dart to evaluate and acquire the Unocal properties. Podolsky advised Barret that he was already involved in discussions with another partner, whom he did not name, but suggested that perhaps Dart could join in the agreement on a non-operating basis, if his partner was interested. Podolsky called Layton and asked whether Equinox was interested in allowing Dart to participate in the Podolsky/Equinox venture. Layton declined, stating that he preferred the current one-third/two-thirds arrangement between the parties.

For three days in late August of 1994, Jones met with the Podolskys in Fairfield, Illinois, to formulate the initial bid for the Unocal properties. In reviewing the bidding documents, Michael discovered that the bidding entity was listed as Alma Energy Corporation, not Equinox. Michael believed that Alma and Equinox were one and the same, and was reassured to this effect. Michael did not object to the substitution of Alma on the documents.

On August 23, 1994, the parties submitted their first bid in the amount of $26,250,000, which was rejected. The parties submitted a second bid in the amount of $28,087,500 on August 29, 1994, which was also rejected. Layton testified in deposition that bid amounts were a confidential matter, something to which "outsiders" should not be privy.

On September 13–14, 1994, the Podolskys met with Robbin Jones and two consultants hired by the Podolskys to prepare for a tour of the Unocal properties with Unocal representatives. The parties agreed to split the consultants' fee, as well as a Ryder–Scott bill for an additional economic analysis of the properties, on a one-third/two-thirds basis. At the meeting with the consultants, Jones announced that POC would be buying one-third of the Unocal properties with Equinox. On September 15–16, 1994, the parties

toured the Unocal facilities with the consultants and Unocal employees. While viewing the facilities, Michael suggested that POC could handle operations of more than one-third, a suggestion which Stephen M. Perry, Sr., Equinox's vice-president of production, dismissed. Perry told Michael that POC should not operate more than the agreed-upon one-third.

Prior to the submission of the final bid, Michael met with Jones and a few Unocal employees in Houston to clarify some information. On September 22, 1994, the parties made their final bid. Alma sent the proposed purchase and sale agreement with the final bid to the Podolskys prior to submission to Unocal.

Alma applied for financing with Den Norske Bank in Houston. William Moyer, a vice-president at the Bank handling the loan, prepared a "Credit Presentation Report" in order to obtain committee approval of the loan. Layton provided Moyer with the information for the report. According to the report, "Alma has reached a verbal agreement with another company to sell one-third of the Unocal property at or shortly after closing at which time the facility will be reduced to $44 MM with equity of $2 MM for development Cap Ex."

The Podolskys also began to make arrangements to finance their one-third share of the purchase price. They arranged for the backing of First National Bank of Fairfield. Additionally, in January 1995, POC sold $1,000,000 in securities to raise the necessary capital to cover its share of the deal.

On December 14, 1994, Alma and Unocal signed the final sale agreement. Jones called Michael Podolsky to tell him that "we won the bid." Michael and Jones arranged to meet with Steve Perry in New Orleans on December 20, 1994 to discuss the operations of the properties. Layton called Bernard that same day to inform him that their bid was accepted.

In New Orleans, Jones advised Michael that Equinox would not allow POC to operate any of the properties initially, but that perhaps in six months to one year Equinox might allow POC some operations. When Michael replied that POC could not invest nearly $10 million and have no control over its investment, Jones suggested that POC should consider taking a smaller share than the agreed-upon one-third. Jones told Michael to wait until after the first of the year to discuss operations with Layton.

Further attempts to define the relationship were unsuccessful. Throughout January and February of 1995, the parties met and corresponded, but were unable to agree about the future operations of the properties. Although neither Layton nor Galesi objected to POC's acquisition of one-third ownership of the properties and both assured the Podolskys that Alma/Equinox intended to keep its commitment to assign POC its one-third interest, the parties were unable to produce a written memorandum of agreement.

On February 10, 1995, Michael Podolsky sent Layton a proposed "Memorandum of Agreement" which purported to memorialize the agreement between Alma/Equinox and POC. Layton responded to Michael's proposed memorandum by facsimile dated February 21, 1995, stating that Alma/Equinox refused to either sign the proposed memorandum or to recognize POC's interest in any aspect of the Unocal acquisition.

On March 8, 1995, Bernard Podolsky filed suit in state court in Wayne County, Illinois, against Equinox, Alma, Unocal, and Marathon Oil Company seeking enforcement of the oral agreement with Alma/Equinox. Also on that date, Podolsky recorded *lis pendens* notices against the properties. The parties met in an attempt at settlement on March 17, 1995, after Alma's putative lender, Den Norske Bank, informed Alma/Equinox that it would not extend the necessary credit until or unless the litigation was resolved and the title cleared. Den Norske Bank agreed to lend only if additional security in the form of personal guarantees were provided. Unocal, however, remained "ready, willing, and able" to close the transaction even after learning of the Podolskys' suit. At the settlement conference, the Podolskys presented a written settlement proposal whereby Alma would relinquish operational control of eight properties. Alma/Equinox rejected the proposal and advised Podolsky that if it did not

dismiss its lawsuit and withdraw the *lis pendens* notices, Alma would forfeit its rights to the property. On March 20, 1995, Podolsky dismissed its lawsuit without prejudice and dissolved the *lis pendens*. The Unocal–Alma deal closed two days later. On April 19, 1995, plaintiffs refiled their lawsuit in Wayne County, which Alma removed to federal court. Alma, Equinox, Layton and Galesi counterclaimed, alleging abuse of process, intentional interference with business relationship, and civil conspiracy.

The Podolskys filed a motion to dismiss Alma/Equinox's counterclaim and Alma/Equinox filed a motion for summary judgment. The court ruled on both motions in an opinion dated September 4, 1996, in which it granted Alma/Equinox's motion to dismiss, granted the Podolskys' motion to dismiss as to the abuse of process claim, and denied the Podolskys' motion to dismiss as to the remaining counts in the counterclaim. On June 11, 1997, the court denied the counter-defendants' motion to reconsider its grant of summary judgment with respect to the original complaint, granted the counter-defendants' motion for summary judgment with respect to the abuse of process counterclaim, and dismissed the counter-plaintiffs' remaining counterclaims with prejudice. Both parties filed timely notices of appeal.

ANALYSIS

A. *Defendants' Motion for Summary Judgment*

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor. Summary judgment is proper where there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

■ For an oral contract to exist, the parties must have had a meeting of the minds with respect to the terms of the agreement and must have intended to be bound to the oral agreement. *See M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991) (applying Illinois law). The exis-

tence of an oral contract, its terms, and the intent of the parties is a question of fact. *See Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 848 (7th Cir.1998) (citing Illinois cases). It may become a question of law, however, "if the facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.*, 897 F.2d 288, 290 (7th Cir.1990).

The question before us is whether plaintiffs presented enough evidence to warrant a trial on their claim for breach of contract. The district court found that the inconsistencies in the record regarding the terms of the alleged agreement and the deposition testimony of Bernard Podolsky where he stated that the relationship with Equinox was exploratory led to the conclusion as a matter of law that there was no binding agreement between Podolsky and Alma/Equinox. We disagree.

■ A review of the record reveals that there is a genuine dispute as to whether POC and Equinox entered into an enforceable oral contract. There appears to be no dispute that the parties did enter into an oral contract: Alma/ Equinox never disputes the existence of a contract, but rather maintains that the contract is unenforceable. We will therefore assume the existence of an oral contract. *See Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir.1996) (issues not raised in the district court are deemed waived).

Alma/Equinox offers three reasons in support of its theory that the contract is unenforceable. First, it argues that the terms of the contract are too indefinite to be enforceable. In support it cites the absence of an agreement on the division of operational control. A review of the record, however, demonstrates that a genuine dispute exists as to whether the parties did in fact have an agreement regarding the division of operational control. POC argues that the parties agreed to divide the Unocal properties on a one-third/two-thirds basis and offers a great deal of evidence to support this contention.

For example: Michael Podolsky asked Equinox's Steven Layton if Dart Oil Company, another approved bidder for the Unocal properties, could join their venture, and Layton replied that he preferred to "go ahead with the current one-third/two-thirds venture"; Robbin Jones made an announcement during a meeting with consultants in preparation for a tour of Unocal's facilities that Podolsky would be buying one-third of the properties with Equinox; Equinox and Podolsky agreed to split the cost of the consultants on a one-third/two-thirds basis; Michael Podolsky suggested after touring the Unocal facilities that Podolsky could operate up to one-half of the properties, to which Equinox's Steve Perry responded that Podolsky could not own one-third and expect to operate one-half; the "Credit Presentation Report" prepared by Den Norske Bank in furtherance of processing Alma's loan for the acquisition stated that Alma reached a verbal agreement with another company to sell one-third of the Unocal property at or shortly after closing; Robbin Jones called Michael Podolsky to advise him that "we won the bid" and suggested that the two meet in New Orleans to discuss the division of the properties, at which time Jones told Michael that Equinox insisted on operating the entire field and that perhaps Podolsky should not purchase an entire one-third; after Podolsky became concerned that Alma/Equinox would not honor the agreement, Layton assured Michael that Alma would honor its commitment to assign Podolsky its one-third interest; at a subsequent meeting to work out the details of the division of the Unocal properties, Galesi and Layton reiterated their promise to honor the one-third deal.

The only evidence offered by Alma/Equinox to counter that there was no agreement to divide the property on a one-third/two-thirds basis is the statement made by Michael Podolsky after viewing Unocal's operations that POC could handle operating up to one-half of the properties. The fact that Michael Podolsky offered to operate one-half of the Unocal properties does not compel a conclusion that no agreement was reached as to the division of operational control. This statement is simply an additional fact for the jury to consider in determining whether an enforceable contract exists between POC and Alma/Equinox. Moreover, in response to Alma/Equinox's argument that more concrete terms of operational control are required, POC contends that it is industry practice to enter into a joint operating agreement after the acquisition of the property. We believe that such evidence creates a genuine dispute of fact, one more appropriately left for a jury to decide.

Additionally, contrary to the district court holding, the fact that Bernard Podolsky at one point viewed Michael's discussions with Equinox to be exploratory does not end the discussion. After Michael's initial discussions with Robbin Jones of Equinox, it was entirely appropriate for Bernard to characterize the Podolsky–Equinox relationship as exploratory. All business relationships begin as exploratory. POC submits, however, that at a later point in time the relationship progressed into a more definite one. Taking the evidence in a light favorable to the non-movant, as we must on a motion for summary judgment, we find that a genuine issue of fact exists as to whether a binding and enforceable agreement existed between the parties.

■ Second, Alma/Equinox claims the contract is unenforceable because Robbin Jones had no authority to bind Equinox and Alma to a contract. The district court agreed with defendants, and ruled that Jones had no authority to bind Alma/Equinox as a matter of law. The existence of an agency relationship is a question of fact. *Citicorp Sav. of Illinois v. Rucker*, 230 Ill.Dec. 153, 692 N.E.2d 1319 (1998). We believe the district court engaged in impermissible factfinding in concluding that Jones had no apparent or implied authority to bind Alma to the contract. Reasonable minds could differ as to whether Jones and Layton had either the implied and/or apparent authority to bind Alma/Equinox to a contract.

Jones is the Resource Manager for Equinox. One of his duties is to develop new acquisition opportunities for Equinox and to bring to Layton's attention those opportunities he believes are worth pursuing. Layton is Equinox's executive vice-president and is

in charge of the company's day-today operations. Jones obtained the approval of Layton before agreeing with POC to purchase the Unocal properties. Jones and other Equinox employees attended day-long meetings at the Podolskys' property in Fairfield, Illinois and the Podolskys, in turn, attended numerous meetings with Jones, Layton, and other Equinox employees in Texas. Layton forwarded the confidential bid package to the Podolskys, and the parties consulted extensively and met several time regarding the submitted bids. Layton admitted during his deposition that these bids were secret and not something to which outsiders were privy. Jones informed a group of consultants touring the Unocal facilities with the two parties that POC would be buying one-third of the properties with Equinox. The parties split the cost of the consultants' fee on a one-third/two-thirds basis. Jones, Layton, and Galesi even promised the Podolskys they would honor their commitment to assign POC its one-third share after their bid was accepted. The Podolskys dealt directly with Jones and Layton, the owner and one-half of the board of directors, and were never advised that their joint venture required any formal approval by Galesi, who represents the remaining one-half of the board of directors. A genuine dispute therefore exists as to whether Jones and Layton were authorized to enter into the contract with the Podolskys. Similarly, a dispute exists as to whether Equinox and/or Alma ratified the POC contract, given executive vice-president Layton's knowledge of and involvement in the negotiations and his failure to repudiate the agreement.

Alma/Equinox contend that because Alma is the party to the contract and Jones and Layton are employed by Equinox, neither Jones nor Layton had the authority to bind Alma to the contract. We disagree. Both Alma and Equinox are closely held corporations owned by Layton and Galesi. Layton and Galesi are the only members of the board of directors of both companies. Layton is the executive vice-president and in charge of the day-to-day operations of both companies. Galesi is a self-employed investor who is an owner of both Alma and Equinox. Alma has no employees; the Equinox employees work to acquire properties for Alma to own. Alma's only purpose appears to be as a title holding company for Equinox properties. Both companies operate out of the same office in Woodlands, Texas and Layton and Jones both work out of this Texas office.

Moreover, Michael Podolsky acquiesced to the substitution of Alma for Equinox in the bidding documents only after being advised that Alma and Equinox were essentially one and the same. Alma and Equinox presented themselves to the Podolskys interchangeably; according to Michael's deposition testimony, he received a facsimile on an Equinox letterhead with an Alma Energy signature by a land man whose cards said he was a land man for Equinox. Therefore, a genuine dispute exists as to whether Jones and Layton had the authority to bind Equinox and Alma to the Podolsky contract.

Finally, Alma/Equinox argue, and the district court held, that the contract between POC and Alma/Equinox was not enforceable as a matter of law because the agreement fell within the statute of frauds. The Podolskys contend that the agreement is removed from application of the statute of frauds because they partially performed under the agreement. They point to their contribution of time and energy to the evaluation of the Unocal properties, the engineers they hired to assist in that evaluation, and the opportunity they passed up to join with another company in its bid for the properties.

■■■ Partial performance is an equitable doctrine that can remove an oral contract to convey real property from the operation of the statute of frauds. *Hartbarger v. SCA Services, Inc.*, 200 Ill.App.3d 1000, 146 Ill. Dec. 633, 644, 558 N.E.2d 596, 607 (1990).

> Before a court may exercise that discretion in favor of granting the remedy in the case of an oral contract which would normally be unenforceable under the Statute of Frauds, the court must find that the terms of the contract are clear, definite, and unequivocal, that the contract has been at least partially performed by the party seeking the remedy and that the acts alleg-

edly done in performance are positively attributable exclusively to the contract.

*Leekha v. Wentcher,* 224 Ill.App.3d 342, 166 Ill.Dec. 599, 604, 586 N.E.2d 557, 562 (1991) (quoting *Intini v. Marino,* 112 Ill.App.3d 252, 68 Ill.Dec. 12, 445 N.E.2d 460 (1983)). The lower court found that because the terms of the POC–Alma/Equinox contract are vague and uncertain, the doctrine of partial performance cannot remove the contract from the statute of frauds. Because we find that the court erred in deciding that the contract is unenforceable as a matter of law, we must necessarily find that the court's determination about the application of the statute of frauds was also erroneous. Whether the statute of frauds applies to this contract, and whether the doctrine of partial performance removes the contract from the statute, is a matter that relies entirely on the jury's determination of the enforceability of the contract. Therefore, drawing all reasonable inferences in favor of the non-moving party, as we are required to do on a motion for summary judgment, we find that a triable issue exists as to the enforceability of the oral contract.[1]

### B. *Defendants' Counterclaims*

The final issue to address in this appeal is whether the district court was correct in granting the Podolskys' motion to dismiss Alma/Equinox's abuse of process counterclaim. The district court dismissed Alma/Equinox's counterclaim for abuse of process for failure to state a claim upon which relief can be granted, finding that the alleged wrongful filing of *lis pendens* notices cannot support an abuse of process action.

■ We review the grant of a motion to dismiss *de novo. Doe v. University of Illinois,* 138 F.3d 653, 660–61 (7th Cir.1998). Under Illinois law, an abuse of process claim requires proof of two elements: (1) existence of an ulterior motive or purpose; and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings. *Kirchner v. Greene,* 229 Ill.Dec. 171, 691 N.E.2d 107, 116 (Ill.App.Ct.1998).

■ Alma/Equinox urges us to reverse the lower court's holding that there is no cause of action for abuse of process under Illinois law based upon the alleged wrongful filing of *lis pendens* notices. Alma/Equinox argues that an absolute privilege does not extend to the filing of *lis pendens* notices in a non-defamation action. The Podolskys, on the other hand, argue that an absolute privilege arises from the filing of a *lis pendens* notice and protects them from a claim for tortious interference. However, we need not address whether the alleged wrongful filing of a *lis pendens* notice can support an abuse of process claim because the *lis pendens* filing in this case did not involve the misuse of the process of the court, the second element of an abuse of process claim. *See Spiegel v. Zurich Ins. Co.,* 293 Ill.App.3d 129, 227 Ill. Dec. 617, 620, 687 N.E.2d 1099, 1102 (1997); *Arora v. Chui,* 279 Ill.App.3d 321, 216 Ill. Dec. 173, 180, 664 N.E.2d 1101, 1108 (1996). We find that the district court was correct in granting the Podolskys' motion to dismiss Alma/Equinox's abuse of process counterclaim.

### CONCLUSION

We find that a genuine issue of material fact exists as to whether the Podolskys and Alma/Equinox entered into an enforceable oral contract. We therefore REVERSE the lower court's grant of summary judgment in favor of Alma/ Equinox and REMAND this case for trial. All other rulings of the district court are AFFIRMED, including the dismissal of Alma/Equinox's counterclaim. Circuit Rule 36 will apply on remand.

---

1. Because we find that summary judgment was improperly granted with respect to this issue, we need not address appellants' remaining arguments.